**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES** : | |
| : | 06-31 (JR) |
| **v.** : | |
| : | |
| **MAHNDEL GREEN** : | |

<u>DEFENDANT'S SUPPLEMENTAL SUBMISSION IN SUPPORT OF
MOTION TO SUPPRESS TANGIBLE EVIDENCE</u>

Mahndel Green, the defendant, through undersigned counsel, respectfully submits the following supplement to his previously filed motion to suppress tangible evidence.

<u>SUMMARY OF ARGUMENT</u>

The Court should suppress all evidence seized in this case because the evidence seized was the fruit of Mr. Green's arrest without probable cause. Alternatively, the evidence should be suppressed because it is the fruit of the seizure of Mr. Green, which seizure was not supported by reasonable articulable suspicion.

As is more fully set forth below, testimony at the motions hearing held April 12, 2006, established that the only basis for the stop of the Expedition driven by Mr. Green, was one officer's suspicion that the tint on the vehicle might be unlawful. Mr. Green's vehicle was stopped in order for the officer to investigate this suspicion though the officer was ignorant as to the tint law in the District; unsure as to whether the tint on the vehicle actually violated the law (whatever that might be), and without the means to investigate any possible tint violation.

In order to establish either probable cause or reasonable suspicion to believe that the law has been violated, the government must prove that the officer knows the law which he suspects has been violated. *See, e.g., United States v. Lopez-Soto,* 205 F.3d 1101, 1106 (9th Cir. 2000) (reversing district court's denial of suppression motion where traffic stop conducted based on

officer's mistaken belief regarding the law; refusing to create "good-faith" exception to exclusionary rule, court notes that "police [must] make certain that they properly understand the law that they are entrusted to enforce and obey"); *United States v. Chanthasouxat,* 342 F.3d 1271, 1280 (11th Cir. 2003)(holding unconstitutional a traffic stop based on an officer's reasonable but mistaken belief of law, court notes that "it would be "fundamental[ly] unfair[ to] hold[] citizens to 'the traditional rule that ignorance of the law is no excuse,' while allowing those 'entrusted to enforce' the law to be ignorant of it").

Since the officer responsible for stopping Mr. Green did not know the window tint law in the District, he had neither probable cause nor reasonable suspicion to believe that Mr. Green was violating the window tint law in the District.

FACTUAL BACKGROUND

At a hearing on the Defendant's Motion to Suppress, held April 12, 2006, the government presented the testimony of Officer Keith Raynor. On direct examination, Officer Raynor testified that he stopped the Expedition because: "I wanted to check the tint to see was it legal." Transcript of Motions Hearing (hereinafter "Mot. Tr.") at 7.

Officer Raynor's testimony established that he had no training in detecting tint violations, (mot. tr. 53), and that Officer Raynor alone made the decision to stop the Expedition in order to investigate the possible tint violation, without discussing either the tint or the decision to stop the Expedition, with any other officer (Mot. Tr. 27-28).

As is evidenced by the following exchange on cross examination, Officer Raynor confessed complete ignorance as to the law governing window tint in the District of Columbia, and uncertainty at the time he decided to pull the Expedition over as to whether or not the tint on

the vehicle actually violated the law – whatever the law might be.  Finally, neither Officer Raynor nor any other officer involved in the stop of the Expedition, possessed the means to investigate any possible tint violation, *i.e.,* no one involved in the stop had a tint meter.

Q:   And so when you puled the car over, you weren't sure whether the tint was legal or not?

A:   Right.

Q:   Okay.  And in fact, when you decided to pull the car over, you weren't even sure what the window tint law in D.C. in terms of the percentage was.  Isn't that correct?

A:   Right.  That's correct.

Q:   And so to state that more clearly, you didn't know by law what percentage of light has to be transmittable through the window to be lawful in D.C.?

A:   That's correct.

\* \* \*

Q:   Okay. And you didn't have in your possession a window tint meter.  Isn't that correct?

A:   That's correct.

Q:   And in fact, no one, none of the four officers in your vehicle, had a window tint meter.  Isn't that right?

A:   That's correct.

(Mot. Tr. 21-22).

Officer Raynor testified that  his cruiser contained a total of four officers, but before pulling the Expedition over in order to investigate whether or not there was a tint violation, he radioed for backup (Mot. Tr. 24-25).[1]  Rather than stop the Expedition with only the four officers in his own cruiser, Officer Raynor followed the Expedition for 3-4 minutes over a distance of 7-8

---

[1] Officer Raynor at first did not recall whether he had called for backup, but had his memory refreshed with the transcript of preliminary hearing testimony.

blocks, awaiting the arrival of backup (Mot. Tr. 25).

The backup cruiser, which also contained 4 officers, arrived and cut the Expedition off from the front, while Officer Raynor's cruiser pulled in behind the vehicle, ensuring that the Expedition could not be moved (Mot. Tr. 26). Police ran the license plate and determined that the plate matched the vehicle; was not expired, and had not been reported stolen (Mot. Tr. 28). All 8 officers then approached the Expedition to investigate the possible tint violation (Mot. Tr. 26). The eight officers approached wearing their "battle dress uniforms," or army fatigues (Mot. Tr. 5).

Even as officers approached the vehicle, Officer Raynor "still w[asn]'t sure whether or not there was any window tint violation." (Mot. Tr. 27). Moreover, the testimony of Officer Edward Snead established that the rear window of an SUV (such as an Expedition), are exempt from regulation (Mot. Tr. 72). The evidence suggests that Officer Raynor observed the Expedition from behind, since he testified that he followed behind the vehicle (Mot. Tr. 25).[2] Thus, the evidence supports Officer Raynor's candor regarding his inability to assess whether the tint on the vehicle actually violated the law.

ARGUMENT

When two marked police cars blocked in his Expedition from the front and behind such that it could not be moved, and then eight officers approached wearing army fatigues, Mahndel Green was under arrest. *See, e.g., United States v. Laing,* 889 F.2d 281, 285 (D.C. Cir. 1989) (investigatory stop crosses the line, becoming an arrest "if the 'amount of force used is

---

[2] The government did not establish from what position in relation to the truck, Officer Raynor made his assessment of the possible tint violation.

unreasonable under the circumstances"); *United States v. Drayton,* 526 U.S. 194, 195 (2002)(factors to consider in determining whether police-citizen encounter is consensual or a seizure include whether police blocked the citizen's exit, and the number of officers involved).

The government bears the burden of showing that the measures employed during the stop were justified, and therefore did not transform the stop into an arrest. *See, e.g., United States v. Magnum,* 100 F.3d 164, 169 (D.C. Cir 1996)(considering, among other things, number of police and police cars used in traffic stop, and whether defendant was free to leave or to refuse to answer questions, in determining whether stop was transformed into arrest).

In order to lawfully block the Expedition in and approach *en masse,* officers needed probable cause to believe that Mr. Green had committed an arrestable offense. Because officers did not possess probable cause that Mr. Green had committed any – much less an arrestable – offense, the evidence seized as a direct result of Mr. Green's unlawful arrest must be suppressed. As is discussed more fully below, the government has not proven that the level of police force used in stopping Mr. Green was reasonable. Therefore, the stop was transformed into an arrest unsupported by probable cause.

Alternatively, the stop of Mr. Green's Expedition at the very least required reasonable articulable suspicion that Mr. Green had violated the window tint law. Police lacked reasonable articulable suspicion of a window tint violation, since the investigating officer did not know what constituted a window tint violation and was not sure that the windows he saw actually violated the law – whatever it might be. Since police lacked reasonable articulable suspicion that Mr. Green had violated the window tint law, the evidence seized as a direct result of Mr. Green's unlawful stop, must be suppressed.

The critical failure in the government's proof of the quantum of suspicion – whether probable cause or reasonable articulable suspicion – possessed by Officer Raynor, is that the Officer did not know the law which he suspected Mr. Green of possibly violating. When an officer does not know the law; how could it possibly be reasonable for him to suspect that he sees a law violation?

"The Fourth Amendment requires some minimal level of objective justification for making the stop." *United States v. Sokolow,* 490 U.S. 1, 7 (1989). Surely it is prerequisite to the most minimal level of objective justification that "police [] make certain that they properly understand the law that they are entrusted to enforce and obey." *United States v. Lopez-Soto,* 205 F.3d 1101, 1106 (9th Cir. 2000)(reversing district court's denial of suppression motion where traffic stop conducted based on officer's mistaken belief regarding the law; refusing to create "good-faith" exception to exclusionary rule, court notes that "police [must] make certain that they properly understand the law that they are entrusted to enforce and obey").

In *United States v. Hill,* our Court of Appeals considered the constitutionality of a traffic stop based upon an officer's belief that the temporary tags on the stopped car did not contain a VIN. 131 F.3d 1056, 1060 (D.C. Cir. 1997). At the suppression hearing in the district court, Hill submitted evidence that in fact the tags did contain a VIN, while the officer testified that he thought that the tags "might have been altered."[3] *Id.*. The district court denied the suppression motion. Though the court thought it impossible under the circumstances to resolve the factual dispute, the court credited the officer's testimony that "he believed that the car did not have a

---

[3] Because others drove Hill's car off after the stop, police were never able to investigate the VIN violation.

VIN []." *Id.*.

>The Court of Appeals held that
>
>the district court applied a subjective reasonableness test to the officer's decision to stop Hill's car, rather than the objective reasonableness test that is required in such situations. The court noted that it accepted the officer's testimony that 'he believed that the car did not have a VIN [],' but the court never explicitly stated whether or not this belief was objectively reasonable.
>
>* * *
>
>We therefore reverse the district court's denial of Hill's motion to suppress and remand to the district court for a determination of whether it was objectively reasonable for the officer that observed Hill's car to conclude that a traffic violation had occurred.

*Id.*.

The evidence at Mr. Green's suppression hearing established that Officer Raynor did not know the law which he suspected Mr. Green of violating. While Officer Raynor's suspicion may or may not have been subjectively reasonable, such a suspicion without any knowledge of the law, could never be objectively reasonable.

It would be "fundamental[ly] unfair[ to  hold[] citizens to 'the traditional rule that ignorance of the law is no excuse,' while allowing those 'entrusted to enforce' the law to be ignorant of it. *United States v. Chanthasouxat,* 342 F.3d 1271, 1280 (11th Cir. 2003)(citations omitted)(traffic stop by an officer who reasonably believed that Alabama vehicle code required inside rear-view mirrors, though the law actually required only that vehicles have mirrors allowing them a view of the highway behind them, held unconstitutional).

Here, the issue is whether an officer who is ignorant of the law can nonetheless possess reasonable articulable suspicion that the law is being violated. Extensive research failed to uncover a single case addressing an officer's complete ignorance as to the applicable law, though

a few circuits have addressed the effect that an officers' mistake of law, has on the reasonableness of that officer's suspicion. *See, e.g., United States v. Lopez-Soto,* 205 F.3d 1101 (9th Cir. 2000) (suppressing 400 kilos of marijuana seized following traffic stop based upon police's mistaken belief that placement of the vehicle's registration sticker violated the law); *United States v. Lopez-Valdez,* 178 F.3d 282 (5th Cir. 1999)(traffic stop for broken taillight unconstitutional despite officer's good faith belief, since broken taillight not a violation of the law); *United States v. Chanthasouxat,* 342 F.3d 1271 (11th Cir. 2003)(traffic stop for failure to have an inside rear-view mirror unconstitutional where failure to have an inside rear-view mirror did not violate the law).[4]

In ruling that an officer's mistake of law defeats reasonable suspicion of the law violation, the fifth circuit observed:

> The rule articulated by the Supreme Court in *Whren* provides law enforcement officers broad leeway to conduct searches and seizures regardless of whether their subjective intent corresponds to the legal justifications for their actions. But the flip side of that leeway is that the legal justification must be objectively grounded.

*United States v. Miller,* 146 F.3d 274 (5th Cir. 1998) (traffic stop for having a turn signal on without turning, unconstitutional since having a turn signal on without turning is not a law violation).[5]

---

[4] While an officer's mistake of law defeats reasonable suspicion that the law has been violated, an officer's mistake of fact may not. *See, e.g., U.S. v. Chanthasouxat, supra,* 342 F.3d at 1276-77 (explaining different Constitutional significance of mistake of fact vs. mistake of law); *Hill v. California,* 401 U.S. 797 (1971)(reasonable mistake of fact as to identity of person to be arrested did not defeat probable cause for subsequent search incident to valid arrest); *Maryland v. Garrison,* 480 U.S. 79 (1987)(search of wrong apartment not violate fourth amendment where mistake of fact as to search warrant authorization was reasonable).

[5] In *Charity v. Maryland*, Judge Moylan echoed this apparent judicial frustration with law enforcement efforts to expand *Whren*: "The so-called '*Whren* stop' [defined as the stop of a vehicle to investigate violation of traffic laws, where the officer's true motivation is "to look for

If even an honest mistake as to the applicable law defeats the reasonableness of an officer's suspicion, complete ignorance of the law must render an officer's suspicion all the more unreasonable. The Constitution does not sanction police action based upon mistaken belief of the law; much less should the Constitution permit police action undertaken in complete ignorance of the law.

If the Court were to sanction this stop, then it would become unnecessary for officers to learn the traffic laws which they purport to enforce. For example, instead of learning the speed limit, police could stop any vehicle on the basis that it seemed to be driving quickly.

The class of people subject to police intrusion is boundless under this rationale. As the Court observed:

> ... [T]he thing that interests me is whether there is probable cause to make that first traffic stop, just to check out the tint.
> * * *
> Not because I think the tint is illegal, but to check it out? Does that mean that if somebody is walking down the street and he's got – he's just walking down the street and he looks a little lopsided, that we can stop and check him out to see if he's carrying something heavy on the other side?

(Mot. Tr. 56).

How could there ever be more than an "inchoate hunch" that someone is breaking the law, if police are not even required to know the law they are entrusted to enforce? *Compare*

---

narcotics violations"] is a powerful law enforcement weapon. In utilizing it, however, officers should be careful not to attempt to 'push out the envelope' too far, for if the perception should ever arise that '*Whren* stops' are being regularly and immoderately abused, courts may be sorely tempted to withdraw the weapon from the law enforcement arsenal. Even the most ardent champions of vigorous law enforcement, therefore, would urge the police not to risk 'killing the goose that lays the golden egg.'" 735 A.2d 556, 558 132 Md. App. 598, 601 (2000) (continued detention beyond that needed to investigate the traffic violation – following too closely for weather conditions – violated Fourth Amendment).

*Terry v. Ohio*, 392 U.S. 1 (1968).

Moreover, *Terry* teaches that in order for a seizure to be reasonable, it must be (1) justified at its inception, and (2) reasonably related in scope to the circumstances which justified the interference in the first place. All of the foregoing arguments have addressed the first question. But officers' seizure of Mr. Green also fails miserably on prong number two.

It is hard to imagine a less reasonable means to investigate a possible window tint violation, than for a car already filled with four officers, to not only call for -- but await the arrival of – a backup cruiser also filled with four officers. This wholly out of proportion police response became even less reasonable when all eight assembled officers approached the car after first determining that the plates were legitimate in every way.

Capping off the not only unreasonable but almost comically absurd police response to the possible tint violation, was the complete inability of any of the eight assembled officers, to investigate the tint. The *only* police response which would have been "reasonably related in scope," to the circumstances which justified the interference in the first place, would have been for one or more officers to approach with a tint meter in order to investigate the possible tint violation. Yet not one of the assembled eight officers possessed a tint meter or any other means to investigate the alleged possible violation.

No case demonstrates the unreasonableness of the police response to this situation better than *Terry,* itself. There, a 35 year veteran of the Cleveland Police observed two men who were unfamiliar to him although he had been patrolled downtown Cleveland for 30 years. 392 U.S. at 5. The officer could not say why, but he thought that the two men "didn't look right."

In light of his suspicions, the officer then moved to a location where he could observe the

two. *Id..* He then watched as the two men "cased" the stick-up of a store. *Id.* at 5-6. The officer watched as the men each took five to six turns apiece walking past stores, pausing to peer into one store, then walking back to peer into the same store window. *Id.* at 6. Thoroughly suspicious, the officer then approached the suspects and patted one down, finding a weapon. *Id..*

Unlike the officer in *Terry,* who investigated his suspicions before subjecting the suspects to a seizure, Officer Raynor testified that he had no more than seen tint which he thought might or might not be illegal, when he decided -- without discussing the matter with any of the seven other assembled officers -- to stop the car. Moreover, Officer Raynor made the decision to effect the seizure ostensibly for the purpose of investigating the possibility that there was a tint violation, without being in a position to investigate that possible violation.

Short of seizing Mr. Green, it would have been reasonable for the officers, for instance, to have driven near to the Expedition to better ascertain whether or not the tint was lawful. Officer Raynor could also have inquired of the seven other officers whether any of them knew the law which he purported to be interested in enforcing. Likewise, Officer Raynor might reasonably have discussed with any of the seven other assembled officers whether the tint appeared illegal to any of them.

Instead of pursuing any of these reasonable alternatives, Officer Raynor chose not to investigate the matter – nor to ascertain the law -- prior to subjecting Mr. Green to a seizure.

Because it was not reasonable for police to block Mr. Green's Expedition in, and then for eight officers to approach the vehicle, none of them possessing a means to investigate the alleged possible tint violation; Mr. Green's seizure violated the Fourth Amendment. The evidence

seized as a direct result of his unreasonable seizure must therefore be suppressed. *Wong Sun v. United States,* 371 U.S. 471 (1963).

WHEREFORE, for the foregoing reasons, and for such other reasons as may appear at any further hearing on this motion, Mr. Green respectfully requests that this Court suppress the use as evidence of all tangible objects allegedly seized from his person or from the vehicle he drove on January 11, 2006.

Respectfully submitted,

_____
Nikki Lotze
Counsel for Mr. Green
Roberts & Wood
6801 Kenilworth Ave., Suite 202
Riverdale, MD  20737
(301) 699-0764

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Defendant's Supplemental Submission in Support of Motion to Suppress Tangible Evidence has been delivered by facsimile to AUSA Denise Clark, this \_\_\_\_ day of _____, 2006.

_____
Nikki Lotze