FILED

JUN 1 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        :
                                 :
   v.                            :   Crim. Action No. 06-0031 (JR)
                                 :
MAHNDEL A. GREEN,                :
                                 :
        Defendant.               :

**MEMORANDUM**

At about 11:30 p.m. on January 11, 2006, MPD Officer Keith Raynor, driving a police cruiser with three other policemen on board, spotted a black Ford Expedition on New York Avenue, N.W. in the First Police District of Washington, D.C. Officer Raynor thought the windows of the Expedition were "real dark" and decided to pull over the Expedition to see whether the tint was legal. Before doing so, he asked for backup and followed the Expedition for several blocks until the arrival of a second police cruiser, which also carried four policemen. The two cars then pulled the Expedition over, with Raynor's vehicle immediately behind and the backup unit immediately in front, leaving the Expedition with no place to go. As Officer Raynor approached the Expedition the driver lowered his window.

Officer Raynor said that at soon as the passenger window was lowered, a strong alcohol smell emanated from the vehicle; that he asked the driver, defendant Mahndel Green, the only occupant of the vehicle, whether he had been drinking; that

Green said no; that he asked what was in a cup located in a cupholder on the Expedition's consol; that Green answered "tea"; that he asked for the cup and was given it; that the small amount of liquid in the bottom of the cup "smelled like cognac"; and that at that point he asked Green to step out of the car because he was going to be placed under arrest for having alcohol in the vehicle.  Raynor said he later discovered a small bottle of Remy Martin in the back seat.  Raynor said that Officers Holmes and Partier were with him at the driver's window, that he passed the cup to Officer Holmes so Holmes could smell it, and that he then poured out its contents.  Raynor did not smell liquor on Green's breath.  He did not perform any test for blood alcohol level or intoxication.  He did not photograph the cup.

It is undisputed that Raynor took Green out of the vehicle, placed him under arrest for alcohol, patted him down, and found a loaded Smith & Wesson revolver in his waistband.  The facts leading up to the arrest and discovery of the gun, however, are sharply disputed.

The defendant's testimony was that the liquid in the cup was indeed tea; that he had purchased a bottle of Arizona iced tea earlier in the day; that he had poured it into a cup with ice because it was warm when he bought it; that he had just come from a club where he was auditioning acts for a comedy show he was producing; that he had not been drinking; and that his

consumption of alcohol was strongly contraindicated by a medication he was required to take every day and had in fact taken a short time before.[1] Green testified that the Remy Martin bottle in the back seat (which was empty -- a fact that Raynor did not volunteer, but did not dispute) had been left there by a passenger early in the day.

To rebut Green's testimony, the government called Officer Hamilton, who testified that he was standing at the passenger side of the vehicle when Raynor "passed around" the cup, that he sniffed the cup, and that it smelled like liquor, although he could not say what kind.

Policemen looking for excuses to stop vehicles they consider suspicious have found the District of Columbia's tinted windshield law to be a useful device. The Motor Vehicle Tinted Window Amendment Act of 1994 was adopted by the D.C. Council and became effective in 1994, D.C. Code § 50-2207.02 (2001). It prohibits operating or parking a motor vehicle on the public streets or spaces of the District of Columbia if the vehicle has a front windshield or front side windows that allow less than 70 percent light transmittance or a rear windshield or rear side windows that allow less than 50 percent light transmittance. It

---

[1] The reason why defendant was taking the medication was not explained on the open record but was revealed to the Court in a confidential proffer made at sidebar. The Government accepted the proffer.

provides for a $50 citation for violation of the provision.  A special order of the Metropolitan Police Department issued on September 27, 1995, establishes enforcement procedures for the law and provides a detailed enforcement policy, requiring officers to conduct a window illumination check with a tint meter before citing a driver for violating the tint law.  A police officer not certified in the use of a tint meter must request the assistance of a certified officer to conduct a window illumination check.  If tint measurements indicate a violation, the officer conducting the window illumination check is to prepare a PD Form 61-C, which is an order requiring that the car be inspected.  Any vehicle with less than 25 percent light transmittance in either the front windshield or front window is to be deemed a "health and safety risk" and immediately towed for inspection.

       The record of this case reveals a number of deviations between MPD's tint window policy and its actual practice.  Nobody appears to know who has the 100 window tint meters that were purchased to enforce the law.  Officer Raynor's testimony was that the measured tint of the Expedition was only 10 percent light transmittance, but the car was not immediately towed to an inspection station.  No citation was issued.  It was disturbing to learn, in the course of this suppression hearing, that there is a clear geographic pattern to MPD's enforcement of the tinted

window regulations: Over a thirteen month period, from April 2005 through April 2006, 820 window tint infractions were issued in the First District -- that is, south and east of New York and Florida Avenues and Benning Road to the Anacostia River. That is more than four times as many as were issued during the same period for any other district. Also, it seems that certain police officers have become specialists in the issuance of tinted window citations. In this same thirteen month period, the officer wearing badge number 3771 issued 276 tinted window citations in the First District alone. The District was unable to respond to questions by the Court and counsel as to how many tinted window vehicle stops were followed by vehicle searches or attempted vehicle searches. Data allowing for a correlation between tinted window infractions and crime statistics for the District were unavailable.

The tint window law is as close to a purely pretextual reason for stopping vehicles as can be found in the real world of everyday police work. The officer who made the stop in this case, Officer Raynor, had no training in the window tint regulations, was not certified to use a window tint meter, did not have a window tint meter or an officer certified to use it in his cruiser, and did not consult with his partners about his observation that the Expedition's windows were "real dark." Raynor also failed to follow the prescribed enforcement procedure

of advising the operator "that there is reasonable cause to believe the window tint may exceed the maximum allowance and that the light transmittance of the vehicle's glass will be measured" -- this despite the undisputed testimony of both Raynor and the defendant that, when the Expedition was stopped, the defendant demanded to know what probable cause the officer had for stopping him.

It is now hornbook law that police officers may stop vehicles upon any pretext, even one as contrived as the one employed in this case, if the stop is objectively reasonable when measured by the totality of the circumstances. See. e.g., Scott v. United States, 436 U.S. 128, 137 (1978); United States v. Holmes, 385 F.3d 786, 790 (D.C. Cir. 2004). Probable cause to arrest and search the driver or an occupant of a vehicle, however, or to conduct a search prior to arrest, requires more. There was no testimony about nervousness or evasiveness on the part of the defendant that might have put the officer in fear of his personal safety so that he could ask the defendant to step out for a pat down. See, e.g., Terry v. Ohio, 392 U.S. 1 (1968); U.S. v. Price, 409 F.3d 436, 441 (D.C. Cir. 2005). It is undisputed that a tinted window violation is not an arrestable offense and does not justify the search of a person or his or her vehicle without more. John Doe v. Metro. Police Dept. of D.C., 445 F.3d 460, 469 (D.C. Cir. 2006). The probable cause offered

by Officer Raynor for his decision to take the defendant from the car and to search his person was the asserted presence of an open container of alcohol in the Expedition. Here too the standard is an objective one. To establish probable cause, the facts and circumstances must be "sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense." Id. at 468 (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).

On a motion to suppress, the movant has the burden of establishing by a preponderance of the evidence that his Fourth Amendment rights were violated by the challenged search or seizure. See. e.g., Rakas v. Illinois, 439 U.S. 128, 131 (1978); U.S. v. Hicks, 978 F.2d 722, 723 (D.C. Cir. 1992); United States v. Matlock, 415 U.S. 164, 177 n.14 (1976).

Here, the preponderance of the evidence favors the defendant. Green's testimony about how he spent the day, where he bought the tea, how the empty bottle of Remy Martin came to be in his back seat, and his aversion for medical reasons to using alcohol, was detailed and credible. Officer Raynor's testimony about smelling cognac in the car was explainable by the empty bottle of cognac in the back seat (the record does not disclose whether it was capped or uncapped). Neither he nor the other officers on the scene bothered to retain the liquid in the cup or even the cup itself. There was a major and significant

discrepancy between Officer Raynor's testimony that he gave the cup to Officer Holmes to smell and then poured out its contents, and the testimony of Officer Hamilton (who was not mentioned by Raynor) that he too, smelled the cup.  I did not find Officer Hamilton's testimony to be credible.  On the points of conflict between the testimony of the defendant and Officer Rayor, I found the defendant's testimony to be the more convincing.

I concluded accordingly that there was no probable cause for Green's arrest.  Without the arrest, there was no justification for the search, and the fruits of the search were accordingly suppressed.

 

JAMES ROBERTSON
United States District Judge

discrepancy between Officer Raynor's testimony that he gave the cup to Officer Holmes to smell and then poured out its contents, and the testimony of Officer Hamilton (who was not mentioned by Raynor) that he too, smelled the cup.  I did not find Officer Hamilton's testimony to be credible.  On the points of conflict between the testimony of the defendant and Officer Rayor, I found the defendant's testimony to be the more convincing.

I concluded accordingly that there was no probable cause for Green's arrest.  Without the arrest, there was no justification for the search, and the fruits of the search were accordingly suppressed.

JAMES ROBERTSON
United States District Judge